May it please the Court, Counsel? My name is Ron Perry. I represent the appellants in this case. My co-counsel is Curtis Coulter, seated in the front row there. Mr. Coulter's daughter, Kendra, is also with him. She's a freshman law student at the University of Colorado School of Law. Great. Glad to have you on here. And she wanted to sit in today. Representing MetLife is Philip Stano. Mr. Stano and I have known each other quite a few years. He's a great lawyer. Coincidentally, his daughter is also in law school at Northwestern University, and her name's Audrey, and she's present here in the courtroom today. Anybody else you want to introduce before we get down to business? I suspect that we'll hear opinions from them maybe long before we get your opinion in this case. Your Honor, this appeal— No, no, we can be quick. This appeal arises from Metropolitan Life Insurance Company's program known as a retained asset account program. Let me cut to the chase. I think you have a legitimate gripe about not getting a check instead of getting a book of drafts, but I'm having a hard time putting my finger on what the damage is here. Okay. Well, the damage clause in the policy is very simple to understand. The way the policy is written, damages are payable from the date of death until the death benefit is paid. Sure. And we've got the policy, and we got your briefs on that. So let me walk you through this, and you tell me how your clients were damaged. What you think you should have gotten was a check rather than this checking account, right? Yes. If you'd gotten a check, it would have borne interest of 1.5 percent up until the day it was written. Yes. And then once—it would have borne no interest thereafter until you deposited into some interest-bearing account. That's correct. Okay, we're together so far. So instead you got this—let me call it a checkbook. I know it's not a checkbook. You got a checkbook that bore 1.5 percent interest up until the day the account was established, right? Well, it paid 1.5 percent until the checkbook was issued. Until the checkbook was issued. Then it reduced. Let's use the same language. And bore 0.5 percent thereafter. Yes, Your Honor. Okay. So if you had gotten a check, between the time that you got it and put it into a bank account and it cleared, you would have gotten no interest on the money. Correct. Now you get a checkbook with a check you can write. You get 0.5 percent interest on the money until the day you can put it into—until the day you write a check and put it into some other interest-bearing account. We're with each other so far? You're correct. Yes, sir. Tell me how you possibly lost any money from this. And I'll accept for the moment the notion that this was a breach of the contract. They should have sent you a check instead. How did you lose any money? Well, your analysis there assumes that when they send the checkbook, it's a blank book of drafts, that that constitutes payment under the contract. No, I'm assuming it does not constitute payment. I'm assuming it's a breach of the contract. My question now is how was your client damaged by that breach of the contract? Your client got exactly the same amount of interest on the principal amount as would have accrued had a check been sent. Your client continued to get interest on that amount, which would not have occurred had a check been sent, until the point in time when your client deposited the funds into another account. What was the damage? Well, the damages are set by the contract. Until payment is made, I mean, you're assuming that payment is not made by sending this blank book of drafts. Until payment is made, the policy provides that we're to receive interest at an interest level. So your theory is because payment was not technically made, you're entitled to 1.5 percent interest. Right. Had payment been made in the way that you claim, you would have received less interest than you do under this scheme, correct? Not necessarily. Well. I mean, it depends on what they did with the money. No, because in that gap, in that gap period, after all, you could have deposited a check in the total amount into any other investment once you got this checkbook. So in that gap period, they're giving you 0.5 percent interest. You would have received none. I would agree with that. Okay. If a check, an actual check was written and received, between the period of time that it was received and deposited into an interest-bearing account, there would be no damage. So your theory of damages is that notwithstanding the fact that they did something, you're entitled to 1.5 percent interest until when? Until the money is actually received by the clients. Until a check is actually received, not money. Until they write checks and take money out of the account, they're not paid. Okay. I understand your theory. Okay. And it's not a theory that we developed on our own. It's the damages that are required under the terms of the contract until payment is made, and payment is defined as immediately and in one sum. So until there's payment made immediately and in one sum, we're entitled to 1.5 percent. So let me ask you a question that bears on that theory. Let's say the contract required that the insured amount be paid in $100 bills, and instead you were delivered $20 bills. It would be a breach of the contract. Would you have damages? I don't think so. Why is that different in this case? Well, because there's a difference between receiving a check and receiving a blank book of drafts. Under the Uniform Commercial Code, it defines how debts are to be paid. You know, you can't make up your own method of payment. No, and again, I'm agreeing with you. I'm agreeing with you that there's a breach here. But in order to recover damages in a contract case, you need a breach and consequential damages. And I'm having a difficult time, I think as Judge Silverman suggested, figuring out how, in reality, your clients were damaged by this breach of the contract. Well. You're saying there's a contractual damages clause that tells you that they were damaged. Precisely. But in reality, do you agree with me they weren't damaged at all? No, I can't agree with that because until payment is made as required by the contract, the contract says they're entitled to a 1.5 percent.  And the contract says that. But now step back from the contract. In the real world, did they suffer any damage? I mean, I don't know how to answer that. I guess not. Well, let me ask you this. What's their dollar amount of damage? I mean, figure it that way. Well. How much were they actually out? The dollar amount of damages could be calculated very easily by. . . And what is that? Okay. What is that number? I don't know what the exact number is, but you would apply 1.5 percent to the balances in their retained asset account rather than a half a percent, which was credited to them. I mean, that's essentially what this case is about is they're entitled to 1 percent. Forever? Forever. Until the money is withdrawn from the account. So they can sit there with this asset account and say, hey, I've got a great deal here. I get 1.5 percent. I never have to write. . . I never have to mitigate my damages. I can just hold on to these checks forever. Or MetLife could pay them the way they were supposed to. Okay. Immediately. . . Is there a duty to mitigate? Perhaps. I don't know that we ever got to that issue. Well, but now I'm asking, is there a duty to mitigate? Well, there's always a duty to mitigate. So couldn't they have mitigated completely by writing the check that day? Well, there is, in effect, a mitigation clause written into the policy in that they can only collect delay damages for a period of two years. So that's written into the contract so that they couldn't leave the money in there forever. But they can leave it in there for two years even though they could stop any damage by simply writing a check? Yes. I mean, there is no question but that when they write a check from the checkbook, it's really a draft that they can end their damages at that point. Let's see if Judge Gould has any questions. Well, just on that point you just made, did they have a duty to write a check, write a draft when they had the blank in order to mitigate? Why wouldn't they under basic contract principles? I realize that they can't have damages beyond two years, but why don't they have a mitigation duty at once? I would assume that a court could impose a mitigation duty upon the plaintiffs in this case or the appellants now that would be somewhat less than two years, but that's an issue that the trial court never really got to because of the summary judgment. The mitigation issue really wasn't briefed or argued, and quite frankly, I don't know what the duty, what the exact duty to mitigate is. Generally, there's a duty to mitigate damages, but when there's a clause in the policy that limits it to two years, I would think that would be the applicable time period that would be used on the mitigation argument. So you've gone to about five minutes. Did you want to reserve some time, Mr. Perry? I'll reserve the rest of my time for rebuttal. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court and Counsel, my name is Philip Stano. I represent Metropolitan Life Insurance Company in this case. And all other introductions have been made. And all other what? All other introductions have already been made. Yes, Your Honor. But I have to say one thing just to keep the introductions parallel, that Mr. Coulter is a fine attorney and I've had a, he's a worthy opponent. I wanted to say that in front of his daughter. Seeing as how Mr. Perry was complimentary to me, I feel like I owe that to him. He's already demonstrated that. Your Honor, your questions are giving this case a real-world analysis. But what needs to be factored in is because we're here on summary judgment, you have to look at the facts for these two individual plaintiffs, appellates, because summary judgment was granted on them. It's not the policy in general as it applies to everybody. And the undisputed facts are very clear to show that they were paid for this reason. Mr. Keefe never used his TCA, but he said that he, it was his decision and his decision alone not to access the TCA. He knew he could take his money out whenever he wanted to. He had, for other reasons unrelated to access to the monies, he didn't. He didn't want to commingle his assets with his deceased mother's estate. He, frankly, he didn't need the money. He was a multimillionaire. And he said he was busy. Life got in the way. He purposely did not access the monies. And under plaintiff's theory, they're now asking to profit from his decision not to access the monies. That's simply wrong. Ms. Simon had a very similar experience in that she did not want to use all of her monies out of her account. When she received her first checkbook, one of the first things she did, according to her testimony, is she ordered a second checkbook. She had every intention to keep the account open. Why? Because it was earning .5 percent interest. So you're saying that they accepted this as payment. Is that what you're saying? Yes, Your Honor. They accepted it, and they knew they could access the monies whenever they wanted to. Suppose they got the book in the mail and said, I don't want the book. I want the check that I'm entitled to under the policy. Then what? You could write a check for the full amount. Yeah, but suppose they said, I don't want to write a check. I want to get a check. You could do what Mr. Keefe did. He called up MET and said, I want a check, and they sent him a check. Why should he have to call up and say, I want a check? I mean, let me put it another way. Suppose, I mean, you're a lawyer in private practice. Suppose I come to you and said, I've read your briefs. I understand your theory of what constitutes payment. And come April 15th of this year when I owe the IRS some money, what I'd like to do instead of sending them a check, I'd like to go down to Schwab and open up an account and send the IRS a book of drafts and tell them to go draft themselves, basically. Would that constitute payment? With the IRS, Your Honor, it's always iffy. Okay, let's change it. Suppose it's Verizon. Suppose I get a bill from Verizon and I say, here's a book of drafts. Go write yourself a draft. Would that be payment of that bill? Your Honor, I don't know about that scenario, but I know about this scenario. Suppose I'm a client of your law firm and you send me a bill. I mean, can I pay your bill by going down to Schwab and opening up an account and sending you a book of drafts? We would gladly fill it out. What is the difference in the scenario you're asking, Your Honor? It's endorsing the back of the check and depositing it in the bank after standing in line, or it's endorsing the front of the check. The difference is payment is you make payment with legal tender or a check that's immediately payable, not by telling somebody to go fill out a book of blank drafts and go put it through a collection. That's not the way in a commercial world you pay your debts. With these two individual plaintiffs, it was acceptable to them and they operated as if it was their story. Clearly not acceptable. They've sued about it. After taking advantage of the benefits. Well, they may have no damages. That's a separate issue, but you're going to have a hard time convincing me that this is payment. And look, we all know the motive. MetLife gets to hold on to the money. They get to hold on to the principal amount until it's drawn away, and presumably they're making more than 0.5 percent interest on the investments. I hope they are. I've got a policy. And so it's, you know, your client does this in order to hold on to the money. Your client doesn't do this for the convenience of its patrons. But, Your Honor, the beneficiary is not damaged. Well, that's a different issue. That's true. That's a different issue. But you're trying to convince Judge Silverman or answer Judge Silverman's questions by saying, oh, this is the same as payment. My law firm would take it. It's not the same as payment. But, Your Honor, the practice that MetLife employs with regard to the TCA is the same practice that's employed with Bank of America with their checkbooks. They pay Ms. Simon testified she earned no interest on her Bank of America checking account. Now you're segueing over into damages where I'm having some difficulty with the plaintiff's case. But on the breach side, you have a contract that says we will pay in a lump sum a certain amount of money, and you don't. It doesn't say lump sum, Your Honor. Well, we will pay a certain amount of money. Right. And so you've got to convince us that sending somebody a checkbook is payment. And I think that your analysis is correct in terms of what the legal issue is, and that is, is the total control account payment under the contract? And I think it is under Section 5 and are under Section 20. First Circuit says no. The Mogul case? Your Honor, I understand it's an ERISA case, and that's why the damages issue is different. But doesn't the First Circuit say that's not payment? Your Honor, the Mogul, it does. But the Mogul decision was based on a motion to dismiss where a footnote 6 of Mogul said we have to take the allegations of plaintiff as true. Plaintiff alleged in the complaint that it was not a lump sum payment. They had to accept that factual allegation as true. If you look at every appellate court decision post-Mogul, they were all decided on summary judgment, and every one of them, every one of them said that the retained asset account constituted payment. Indeed, two First Circuit panels post-Mogul, the Merriman case and the Van der Luten-Garden case, both stated that it gave, that the retained asset accounts in those cases gave the beneficiary unfettered access to their money. And so Mogul is being ignored and is being, is by all the circuits that have looked at the decision since Mogul. Let me see if Judge Gould has any questions. Well, I have one that's a little bit off the trail of the argument thus far, so I'll just ask an open-ended, and I'll apologize if I'm off base on it. But does Nevada revised statutes 104.3310 subpart 3 have any bearing on whether there's a breach or not? Is that the uniform? Excuse me, Your Honor. Yeah, that's your UCC provision. But the focus in the briefing is primarily on subsection 2, and I wondered if you'd analyze subsection 3. Your Honor, the UCC, we have analyzed it. The UCC analysis, which plaintiff chiefly relies on in addition to Mogul, has not been applied by any of the appellate courts around the country when looking at these cases. They all looked at the issue of whether they applied a contract interpretation analysis as opposed to a UCC analysis. And let me state it differently. Under the plaintiff's argument under the UCC, the retained asset account can never be payment because it's not a negotiable instrument. However, as I said earlier, not that the ERISA cases I think are controlling or even relevant, but if you look at the ERISA cases that plaintiff has cited, every appellate court in the country, the First Circuit, Second, Third, and the Seventh, found that the retained asset account constituted payment, completely undermining plaintiff's arguments. And why was it payment? Because if you look at all the indices of payment, which is fulfillment of the obligation, providing access to all monies due and owing, and having control over those assets and discretion, the retained asset account meets the indices of payment. And that's what this case boils down to. And if it's not payment under Section 5, then we think it certainly would be payment under Section 20, which says that alternative methods of payment can be made. So it comes under either Section 5 or 20. I tend to take a very practical approach. I think it comes under Section 5. I deposed both plaintiffs for a period of four days, two days each, talking about their checking accounts. They admitted repeatedly. That must have been riveting. It was worse for them than it was for me, Your Honor, because they had to listen to my questions. But they admitted repeatedly that, of course, they knew they could take the money out. They took it out when they felt like it. And to argue now that they weren't paid, that violates common sense. I think it violates reality. In addition to plaintiffs having a duty to mitigate, they weren't damaged. In fact, Ms. Simon liked the approach of the TCA. I asked her, what would you have done with a single check if you had gotten it? She said, I would have put it in my Bank of America account, which paid no interest, according to her testimony. She treated it as if she had been paid. She wrote 30 checks. Fifteen of those checks were written to herself. She had 15 opportunities to close out the account, and she didn't. That, to me, shows that she certainly has a duty to mitigate if she claims that she's being harmed. She certainly knew that she could write a check for the full amount. Your Honor, as the Seventh Circuit said in Rabin, it's not a material difference between issuing a retained asset account or issuing a single check. It doesn't rise to the level of a breach. I truly do not believe there's a breach of contract here. Not in these circumstances where all they had to do was fill it out, and they purposely decided they didn't want to because they wanted to keep it. It's not like it was a burden on them. In the examples that you give, Judge Silverman, this was something that was a benefit to them. And we're looking at a summary judgment on their cases. I'm sorry, Your Honor. But assuming it was a breach for a moment, you would agree that there's no damages? Absolutely, Your Honor. I can't imagine what the damages were. And plaintiffs argue that they were damaged when they chose not to take the money out because they liked what they had. I think it violates public policy. You're letting someone profit by their own actions when they know they have control over reducing and eliminating any, quote, damages. Let me ask you, and I should know the answer to this question, but I can't place my finger on it. Are there published decisions of courts of appeals other than Mogill? Oh, yes, Your Honor. Second Circuit is an unpublished decision. I'm sorry? Second Circuit is an unpublished decision, which is to say it's not for publication. Are there published decisions of courts of appeals? Yes, Your Honor. And I can go through them. If you can't lay your hand on it right away. Actually, I do have them. There's the Van der Luten-Garren decision, and we cited to that in our supplementary authority, which we filed late last week, so maybe it hasn't made its way to you. No, I've got it. With regard to payment, this is what Van der Luten-Garren said, and this is, again, this is key. This is a First Circuit panel post-Mogill. The company in that case was Sun Life. The Van der Luten-Garren panel said, quote, Sun Life gave immediate and unfiltered access to the promised benefit in its entirety, period, let's quote. I don't think that's in dispute anywhere. In other words, they were treating the retained asset account as payment. In Edmondson, the Third Circuit decision, the court said, quote, payment via the retained asset account caused no injury. Right. These are all ERISA cases in which we're dealing with breach of fiduciary duty claims, right? Yes, but they were on a motion for summary judgment. No, I understand. And I think I tend to keep things simple, and I tend to look at the facts in each case, certainly when we're moving to summary judgment. I think the fact that Mogill was a motion to dismiss case where they had to take the allegations as true, that means a lot to me. There was no facts in that case. There was no development. In the other cases there were, and in every case where there was a summary judgment, the court found that payment had occurred under the retained asset account. There's also the Merriman case. Were there differences in the ERISA plan's provisions in those cases? I seem to remember that some of them had provisions that said you can pay out benefits in something other than a lump sum. That's a good question, Your Honor. There were differences in the Merriman case and in the Faber case. The plan said that payment could be made by the retained asset account method of payment. Right. So you had expressed plan authority to do it in those cases. Yes. Not you, but the insurer. Yes, Your Honor. But the Vanderluten-Garren panel, which came after Merriman, it's the latest decision, there wasn't that option, the payment option through an RA did not exist in the plan. And the panel addressed that point. They said it's a distinction without a difference. The question is, was it payment? I just wanted to clear up something. Do I understand correctly that MetLife no longer uses this method of payment? That's not correct, Your Honor. They altered the claim form in 2011, and they allowed for a second option for immediate payment, and that was a single check. But they kept, and this was done. So now it's optional. You can check a box, I want the check, I want the retained asset account. Yes, Your Honor. Or you could check and say I still want the TCA. Got it. Your Honor, we're not defensive about the TCA. We think it's equal or better to a check in every instance. Well, if people agree to it, that's one thing. If you force it on them, that's another, you know. Your Honor, it's not that, if the parties to the contract agree that this is the method of payment, nothing's being forced on anybody. I don't see where they agreed to that. I'm sorry, Your Honor? I don't see where in the contract they agreed to that. It was take it or leave it, wasn't it? Yeah, but the contract doesn't require that they agree to it, number one. And number two, throughout the claim process. But they didn't agree to it. In other words, what is the contractual language about how the benefits are to be paid? What does it say? Section 5 said payment shall be immediate once the claim form is received and processed. It doesn't explain, it doesn't define payment. It doesn't say it must be a check. Right. Well, in any event, the new policy is they can get one lump sum payment as a check where they can agree to it.  Which they didn't in this case. Yes, Your Honor. But a key point is this. Throughout the claims process, MetLife disclosed repeatedly that all they had to do if they wanted their money was to write a single check. I see you're out of time. Thank you. Thank you, Your Honors. Mr. Perry, you get the last word. Your Honor, again, it's a breach of contract case. Section 5 of the policy that he talked about said we will pay the death benefit immediately upon receiving proof. Let me ask you this. Mr. Stano makes the point that no matter how you slice it, your clients accepted this as payment. Maybe they didn't have to. Maybe they had a right to complain about it. But they wound up accepting it. What's your answer to that? The claim form that was preprinted says if your claim is for more than $5,000, you will receive a money market account. They had no choice. I'm not making myself clear. After they got the book of drafts, instead of sending it back and saying, go to hell, I want a check, they kept it. And they wrote drafts on it. And they accepted it as payment for better or for worse. They chose to accept it. Well, I mean, I don't know if it's – if you don't have a choice and it's sent to you, what choice do you have other than to accept it? They could have sent it back and said, I don't regard this as payment. Well, but had they done that, wouldn't that be evidence that MetLife had breached the contract? Yeah, it might. But that's not what they did. Do you agree that both of your clients understood, because the instructions with the account said so, that they, on the day they received this checkbook, could have written a check in the entire amount in the account? They probably are charged with that knowledge. I think it's somewhere in there, by the same token. And I think somewhere in those two days of depositions, four days of depositions, somebody said, I understand I could have written the – Right. But, you know, one of the principal points in this case is that the way MetLife convinces people to leave their money in there or leave part of it in there is they misrepresented that it was a money market account and it was not a money market account. In other words, they believe – But this is not a class action. This is an action on behalf of two people, right? Right. And those two people fully understood that on the day they got the checkbook, they could write a check for the entire amount in the account? I think they're probably charged with that knowledge if they didn't actually – So I'm not – they didn't suffer any – they were – there was no misrepresentation from which they were damaged. Correct? Well, the damage is the breach of contract damage. No, I understand that theory, but now you're saying something different. There was some sort of misrepresentation that might lead them to keep their money in this account when they didn't want to. But you've told me that they had the knowledge they could write the check on day one. Right. And I think you ask about mitigation before having thought about that for a minute. I think mitigation is an equitable defense, and for MetLife to be able to rely on mitigation, they have to have clean hands. Now, when they're misrepresenting the nature of what they're giving to their death beneficiaries, I don't think they can rely on mitigation. Well, my problem with that is the same one. You tell me your clients, these two people, knew that they could write a check on day one for the entire amount. And so my question is, if they thought they were being damaged, and I'm still having difficulty figuring out how, why didn't they just simply write those checks? Well, I mean, perhaps what they – What is the record show? Perhaps what they would have done is put their money in a real money market account had they received the check. Perhaps they would have, but why didn't they? They could have. Nothing prevented them from doing that. You tell me they're charged with the knowledge that they could write the check on day one. We're not talking about a class action here. We're talking about your two clients. True. Wasn't this brought as a class action? This was brought as a class action. We obviously never got to that point. You never got there, so we're only talking about these two people. Never got to that point, yes. So why – Again, I'm not sure that focusing on what somebody would do with the money – in other words, if I hire Mr. Stano to represent me and agree to pay him $1,000, I owe him $1,000. It doesn't matter what he's going to do with that money after he gets it. I mean, for him to stand up here and focus on what they did with their blank drafts when they got them doesn't mitigate the fact that they were entitled to be paid immediately and in one sum, the language that they put into the policy. Let me see if Judge Gould has any questions before we conclude. Judge Gould? I don't – I share the concerns Judge Hurwitz has raised by his questions, and I would frame a less legalistic question in a phrase that we used to hear, just where's the beef, which is my problem with the damage theory here. I can't understand what it is that your clients lost out on. Well, it's contract damages. If I have to show that my clients are worse off because they got a half a percent as opposed to one and a half percent, I probably can't show that. They were both fairly well-off people. But the contract damages are the contract damages, and that's what we sued for. Okay. Let me just finish up, Judge Hurwitz, and then we'll close it off. I'm now focused on your theory. Your theory is, in effect, that this one and a half percent is a penalty clause. In effect, it is. It's delay damages. We're going to pay one and a half percent. We're going to pay what we pay on other large group policies until we pay it. Thank you, gentlemen. The case is submitted. Good morning.
judges: Silverman, Gould, Hurwitz